The COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Appellee,

v.

Leona DURHAM, Appellant.

No. 62290.

Supreme Court of Iowa.

May 30, 1979.

Helen A. Buckley and L. Vern Robinson, Iowa City, for appellant.

Carol S. Egly, Des Moines, for Iowa Civil Liberties Union, amicus curiae.

Duane L. Rohovit, Iowa City, for Iowa City Chapter of National Lawyers Guild, amicus curiae.

Roger J. Kuhle, Des Moines, for appellee.

REES, Justice.

This is an appeal from the report and recommendations of the Grievance Commission in a disciplinary proceeding conducted pursuant to Supreme Court rule 118. On March 21, 1978 the Committee on Professional Ethics and Conduct of the Iowa State Bar Association (complainant) filed a complaint charging Leona Durham (respondent), an attorney admitted to practice in this state, with violations of Ethical Considerations (hereinafter EC 1–5 and 9–6, and Disciplinary Rules (hereinafter DR 1–102(A)(3), (5) and (6). After a hearing before the Second Division of the Grievance Commission on May 23 and June 3 of 1978, the Commission reported its findings that respondent had violated EC 1–5, EC 9–6 and DR 1–102(A)(6). The Commission recommended the respondent "be suspended from the practice of law with no possibility of being reinstated for no less than one year from the filing of the Opinion of the Iowa Supreme Court."

Respondent took a timely appeal from the findings, conclusions and recommendations of the Committee, in accord with Supreme Court rule 118.11, and filed her statement of exceptions on November 13, 1978.

The factual situation which generated this proceeding involves several visits made by respondent to a client, Robert Loney, who was and is an inmate of the Iowa State Penitentiary at Fort Madison. There is considerable dispute as to what exactly occurred during several of these visits. Respondent visited Mr. Loney seven times during the summer of 1977, the visits in question being those of July 2, July 20 and August 5. Respondent admits having kissed and embraced Loney in an affectionate manner during the three visits last referred to. The complainant contends the interaction between Attorney Durham and Loney also involved extensive caressing and petting throughout much of the visits in question. Respondent denies these latter allegations.

All of the visits were conducted in a room called the "south visiting room" in the penitentiary. Consultations and visits were observed by means of a one-way mirror of which both respondent and Loney were aware. Several persons who were then employed at the penitentiary viewed portions of respondent's visits with Loney, and testified at the hearing.

Ronald Myers, a correctional officer, testified regarding the July 2 visit, and stated that he saw the respondent bare a breast for Loney, allowed Loney to rub her legs, and that respondent and Loney were touching each other during almost the entire forty minutes he observed them. He reported such conduct to his superiors at the penitentiary in a handwritten report. His testimony was inconsistent with that of another guard, Sherry Burke (who the record reflects later retained the professional services of the respondent), who was present at approximately the same time as Myers. Burke testified she observed that the respondent's blouse was "puckered" near her breast, but did not report observing any baring of respondent's breast.

There was testimony of several other guards and correctional officers which indicate kissing, caressing and some fondling to have occurred with some regularity during the visits. In addition, photographs taken of one visit by an electrical technician employed by the penitentiary as a photographer were introduced as exhibits before the Commission. These are corroborative of the testimony of the observers to the extent that they show some kissing and caressing to be taking place between respondent and Loney. One photograph indicates respondent's hand placed on Loney's leg. Warden Brewer of the penitentiary also testified that he saw the respondent and Loney embracing on August 5, prior to the time he personally terminated respondent's visit.

Respondent presented testimony in person and by other witnesses with respect to her good moral character. Both she and Loney denied the charges of fondling and more explicit physical contact, but admitted to occasional kissing and embracing during the visits in question.

On the basis of such evidence, the Second Division of the Grievance Commission of this court reached the aforementioned conclusions and recommendations regarding respondent's conduct. We must determine whether they were correct in so doing.

The following issues are presented for review:

(1) Are the findings of fact of the Grievance Commission supported by a convincing preponderance of the evidence in the record?

(2) Are Ethical Considerations 1-5 and 9-6 and Disciplinary Rule 1-102(A)(6), as applied to the conduct of the respondent, so vague as to deny her due process of law as guaranteed by the United States Constitution?

(3) Did the respondent engage in any conduct which violated Ethical Considerations 1-5 and 9-6 or Disciplinary Rule 1-102(A)(6)?

■ Our review of the findings, conclusions and recommendation of the Grievance Commission is de novo. Iowa Sup.Ct.R. 118.11. The charges against the respondent must be established by a convincing preponderance of the evidence. This burden of proof is greater than that ordinarily required in civil proceedings but less than that required in criminal cases. *Committee on Professional Ethics v. Wilson*, 270 N.W.2d 613, 615 (Iowa 1978); *Committee on Professional Ethics v. Crary*, 245 N.W.2d 298, 299 (Iowa 1976).

I. The respondent first contends the Grievance Commission erred in finding there to have been intimate physical contact during her three visits with inmate Loney which are the subject of this inquiry. She denies any physical contact with Loney beyond occasional embracing and kissing and alleges the Commission did not give sufficient weight to testimony in the record attesting to the respondent's reputation for truth and veracity; the net result being a failure by the Committee on Professional Ethics to carry its burden of proof as to physical contact beyond that admitted.

Before reaching the merits of respondent's contention, we note certain ambiguities in the "findings of fact" of the Commission. The findings are stated as summaries of the testimony given and not as derivative determinations based on the whole of the record. It is unclear whether the Commission meant to adopt these summaries in toto, for there is some tension between statements within the testimony. Due to the de novo nature of our review, we draw our own conclusions from the record.

We find a clear preponderance of the evidence in the record indicates respondent and Loney engaged in kissing and embracing during the visits in question, as well as at least occasionally caressing or fondling each other. We do not find a clear preponderance of the evidence to show respondent to have bared a breast for Loney's view.

These findings are drawn from the record, including testimony of those penitentiary employees who viewed the respondent in the visiting room, and that of the respondent and Loney. While there was testimony to the effect that the visits were "very physical", the photographs taken during the visit of July 20 substantiate only the allegations of embracing and kissing, although there is one picture in which the respondent apparently has a hand on the lower portion of Loney's leg.

We conclude that a clear preponderance of the evidence in the record shows the contact between respondent and Loney to have gone, on occasion, beyond kissing and embracing to include caressing and fondling.

II. Before reaching the merits of respondent's constitutional issue, we note that this argument was not presented to, or addressed by, the Grievance Committee. We have recently held that traditional concepts of error preservation are not always appli-

cable to attorney discipline proceedings, especially where the raising of the issue would not have changed the record before the Commission or the course of its proceedings. *Committee on Professional Ethics v. Behnke*, 276 N.W.2d 838, 841 (Iowa 1979). That case also involved a vagueness challenge to provisions of the Iowa Code of Professional Responsibility. Finding the record adequate for such a determination, we now address the issue.

The respondent contends the provisions of the Iowa Code of Professional Responsibility for Lawyers which the Grievance Committee (hereinafter ICPRL) which the Grievance Committee found she violated, EC 1–5, EC 9–6 and DR 1–102(A)(6) are unconstitutionally vague as applied to her conduct in the case at bar. Citing the *Matter of Frerichs*, 238 N.W.2d 764, 768 (Iowa 1976), she argues the relevant provisions of the ICPRL do not comply with the mandate of the due process clause in that a person of ordinary intelligence does not have a reasonable opportunity to know what is prohibited. For the reasons set forth below, we hold the relevant provisions of the ICPRL not to be unconstitutionally vague as applied to the respondent.

In making a claim of unconstitutionality, the respondent assumes a heavy burden in light of the presumption of constitutionality. *Committee on Professional Ethics v. Behnke*, 276 N.W.2d 838, 843 (Iowa 1979); *Chicago Title Insurance Co. v. Huff*, 256 N.W.2d 17, 25 (Iowa 1977).

The respondent is unable to cite any case in which a provision of the Code of Professional Responsibility has been held to be unenforceably vague, nor has our research uncovered any such instance. Yet, attorney discipline proceedings are subject to due process scrutiny. *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Matter of Frerichs*. Other jurisdictions which have approached the question of the constitutionality of standards relating to professional conduct, with language similar to that involved here, have upheld the guidelines in the face of vagueness challenges. *In re Bithoney*, 486 F.2d 319, 324 (1st Cir. 1973) [regarding Federal Rule of Appellate Procedure 46]; *Complaint of Rook*, 276 Or. 695, 705, 556 P.2d 1351, 1357 (1976) [regarding DR 1–102(A)(1) and (5)]; *Matter of Keiler*, 380 A.2d 119, 126 (D.C. App.1977) [regarding DR 1–102(A)(5)]; *Kentucky Bar Association v. Kramer*, 555 S.W.2d 245, 246 (Ky.1977) [regarding Kentucky Rule of Appellate Procedure 3.130]; *Louisiana State Bar Association v. Jacques*, 260 La. 803, 819–822, 257 So.2d 413, 418–419 (1972) [regarding Article 13 § 4 and Article 14 § 11 of the Articles of Incorporation of Louisiana State Bar Association]; *State v. Nelson*, 210 Kan. 637, 640, 504 P.2d 211, 214 (1972) [regarding the word "prejudicial" in DR 1–102(A)(5)]; *Office of the Disciplinary Counsel v. Campbell*, 463 Pa. 472, 481–483, 345 A.2d 616, 621–622 (1975) [regarding DR 1–102(A)(5) and DR 1–102(A)(6) as applied].

None of the aforementioned cases, with the exception of *Campbell*, involved the ICPRL provisions which the respondent was found to have violated. *Campbell* involved a vagueness as applied challenge to DR 1–102(A)(6) and thus turned on the particular facts of the case, as must our determination here. We have stated "constitutional muster is passed where the meaning of the words can be fairly ascertained by referring to similar statutes, prior judicial determinations, the common law, the dictionary, or the words themselves where they have a common and generally accepted meaning." *Frerichs* at 768 of 238 N.W.2d.

EC 1–5 calls upon an attorney to be "temperate and dignified." DR 1–102(A)(6) bars conduct "that adversely reflects on his (or her) fitness to practice law." EC 9–6 prohibits conduct indicating professional impropriety or the appearance thereof. Admittedly, there is little specific guidance on the subject of sexual conduct.

While due process scrutiny is applicable, several courts have applied a vagueness standard less stringent than that applied to criminal statutes as applied by this court in *Frerichs*, adjusting the standard according to the body being regulated. *Complaint of Rook*, 276 Or. at 705, 556 P.2d at 1357; *Matter of Keiler*, 380 A.2d at 126. These

cases first note that attorney discipline cases are civil in nature, rather than criminal. We reached a like conclusion in *Iowa State Bar Association v. Kraschel*, 260 Iowa 187, 148 N.W.2d 621 (1967). The rationales which the courts found compelling in adopting the less stringent standard are (1) the Code of Professional Responsibility was written for lawyers by lawyers, and (2) guidelines setting standards for members of the bar need not and cannot meet the standard of clarity required of rules of conduct for laymen due to the training and specialized nature of the body being regulated. *See Behnke*, at 843 of 276 N.W.2d; *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). As noted in *Behnke*, standards relating to the conduct of attorneys may also be distinguished in that it would be virtually impossible to develop a set of rules to specifically cover all professional activity which could merit discipline, thus necessitating broader standards. The bar must be concerned about the professional activities of its members, and the manner in which these activities reflect upon the integrity of the profession as a whole.

■ If evaluated in terms of the general standard enunciated in *Frerichs*, there may be some doubt as to whether a "reasonable person" would know what is proscribed. Under the less stringent standard of whether a "reasonable attorney" would understand certain conduct to be prohibited, which we now adopt, the ICPRL provisions are constitutionally sound as applied to the respondent. This higher standard of care which we now impose upon attorneys is supported by the aforementioned reasons and the unique and learned nature of the legal profession. The indicia listed in *Frerichs*, at 768 of 246 N.W.2d, as potential sources of notice to attorneys remain applicable.

In holding the relevant ICPRL provisions constitutional as applied to the respondent, we must elaborate upon our understanding of the character of respondent's visits and her conduct with Loney. When she entered the visiting room of the penitentiary, she signed in as an attorney. Therefore, she was representing herself to be appearing in a professional, not personal, capacity. No issue of nonprofessional conduct is now before us and our holding does not include such conduct.

■ When appearing anywhere in a professional capacity, an attorney must comport himself or herself in a manner befitting a member of the bar. This is what is meant by the "temperate and dignified" language of EC 1–5 and the "professional impropriety" terminology of EC 9–6. An attorney familiar with the Code of Professional Responsibility, as all must be, would be on notice of these standards and their general applicability to professional activity. Sexual contact with a client in a professional context is not activity which a reasonable member of the bar would suppose to be allowed by the ICPRL. Such conduct is well outside that which could be termed temperate and dignified and would amount to professional impropriety, both in terms of the dictionary definitions and general understanding of the words used. The respondent has admitted the alleged conduct to be outside the scope of accepted professional conduct. Despite the breadth of the language used in the ICPRL, we hold EC 1–5 and EC 9–6 not to be so vague as applied to the respondent to be violative of due process of law.

DR 1–102(A)(6) presents a more difficult question. To state that an attorney should not do anything which adversely reflects on his or her ability to practice does not provide a great deal of guidance. Were the respondent charged solely with a violation of DR 1–102(A)(6), her argument may have merit. It is only in light of the remainder of the ICPRL, more specifically EC 1–5 and EC 9–6, that we do not find DR 1–102(A)(6) to be unconstitutionally vague as applied to the facts of this case. DR 1–102(A)(6) will receive further attention later in this opinion.

■ III. In its amicus curiae brief, National Lawyer's Guild argues that the ICPRL is being applied to the respondent in a manner violative of the Equal Protection Clause of the Fourteenth Amendment to

the federal constitution. There is no basis in the record for such a conclusion, nor do we find any merit in this contention.

IV. We now address the determinative issues of this appeal, whether the respondent's conduct is violative of EC 1–5, DR 1–102(A), and EC 9–6 and, if so, whether to accept the recommendation of the Grievance Commission that the respondent be suspended from practice with no possibility of reinstatement for a period of one year.

■ As noted above, we consider the respondent to have been present at the visits in question in a professional capacity. The situation before us is rather unique from other cases which have involved alleged sexual misconduct by an attorney in that we have an unambiguous statement of the capacity in which the attorney was functioning at the time of the alleged misconduct. In signing the visitor's log the respondent listed her relationship with Loney as "attorney". While it may have become clear during the course of the visits that the relationship was more than that of client and attorney, nevertheless the fact remains that she entered the institution in her professional capacity. We are faced not with a question of private sexual conduct by an attorney, but with conduct by an attorney who was at least appearing to function in her professional capacity. We are thus unable to accept respondent's argument that the incidents in question were solely of a private nature between consenting adults. She chose to visit as counsel and represented herself as such to the prison authorities.

Attorney Durham's conduct in the visiting room was not "temperate and dignified" as mandated by EC 1–5 and thus does evidence a distinct quantum of professional impropriety as is decried by EC 9–6. Respondent admitted that her alleged conduct was not that which would normally be expected of a lawyer in the situation. Our examination of the record leads us to the same conclusion reached by the Grievance Committee regarding EC 1–5 and EC 9–6.

It is once again with regard to DR 1–102(A)(6) that we are somewhat hesitant in agreeing with the Grievance Committee, although our concern relates more to the degree of respondent's noncompliance. Any violation of the Code of Professional Responsibility necessarily reflects adversely on the fitness of an attorney to practice law. We therefore hold that the respondent has violated DR 1–102(A)(6). This conclusion does not directly reflect upon the respondent's professional competence except to the extent isolated incidents of indiscretion in professional conduct may do so. There is no indication in the record that respondent's representation of Loney was anything less than competent.

V. Having found EC 1–5, DR 1–102(A)(6) and EC 9–6 violated, we must now consider the recommendation of the Grievance Committee that respondent be suspended from the practice of law for a period not less than one year. We do not find the respondent's conduct to warrant so severe a penalty.

A survey of attorney discipline cases from other jurisdictions involving sexual misconduct shows the respondent's activities to be hardly of a nature which would usually be termed reprehensible. See Annot., 36 A.L.R.3d 735 (1971). No illegal act was committed, nor was any validly promulgated rule of the institution broken. There was nothing inherently wrong with the respondent's activities during the visits. If the respondent had not been present in a professional capacity, no violation of the Code of Professional Responsibility would have occurred. See, e. g., Matter of Dalessandro, 397 A.2d 743, 755–759 (Pa.1979); Matter of Wood, 358 N.E.2d 128, 133 (Ind. 1976). We do not mean to say that private sexual conduct by an attorney cannot be violative of the ICPRL, but only that it is not respondent's conduct per se which we find reprehensible on these facts. Rather, it is the legal capacity in which she was acting which we find to be the essential element of these violations.

These charges grew out of three of the seven visits which respondent had with Loney during the summer of 1977. No further violations of the ICPRL are alleged. The record indicates the respondent to have

a good reputation for honesty and character. Finding the occurrences in question to be rather isolated incidents of professional indiscretion which do not raise extensive doubts as to the respondent's fitness to practice law, we conclude suspension for any length of time to be unwarranted. We therefore publicly reprimand and admonish the respondent for conduct violative of Ethical Consideration 1–5, Disciplinary Rule 1–102(A)(6) and Ethical Consideration 9–6.

ATTORNEY REPRIMANDED AND ADMONISHED.

All Justices concur except HARRIS and McCORMICK, JJ., who concur specially.

HARRIS, Justice (concurring specially).

I concur in divisions I, II, IV, and the result.

In division III of the majority opinion the court responds to a contention raised by the National Lawyers Guild. Although I have no quarrel with the legal conclusion suggested in the majority opinion, I believe it is inappropriate for the majority to respond at all. We have said that we should not respond to contentions made in amicus curiae briefs but rather limit ourselves to the contentions raised by parties to the action. *Sauerman v. Stan Moore Motors, Inc.*, 203 N.W.2d 191, 194 (Iowa 1972); *Lorentzen v. Deere Mfg. Co.*, 245 Iowa 1317, 1322, 66 N.W.2d 499, 502 (1954); *State v. Martin*, 210 Iowa 207, 210, 230 N.W. 540, 542–543 (1930).

I agree that respondent should be publicly reprimanded and admonished for her unprofessional conduct, but would limit the grounds to those detailed in divisions I, II, and IV. I therefore concur in the result.

McCORMICK, J., joins in this special concurrence.