**In the Matter of the Application for the Discipline of Gerald Hubert HANRATTY, an Attorney at Law of the State of Minnesota.**

**No. 48374.**

Supreme Court of Minnesota.

March 16, 1979.

R. Walter Bachman, Jr., Administrative Director on Professional Conduct, Lawyers Professionality Bd., St. Paul, for petitioner.

Herbert C. Davis, St. Louis Park, J. W. Cragg, Minneapolis, for respondent.

## OPINION

PER CURIAM.

These proceedings are before the Court on a petition for the discipline of Gerald Hubert Hanratty, an attorney at law, brought by the Administrative Director on Professional Conduct, at the direction of the Lawyers Professional Responsibility Board. The basic facts are not in dispute.

Gerald H. Hanratty has been a member of the Minnesota Bar since 1952. In 1965 Hanratty represented Jerry Agar in a tort action and thereafter in his business affairs. In 1968 Agar was divorced and his ex-wife was given possession of their house. The judgment provided that should Mrs. Agar remarry, the house was to be sold and the proceeds divided between Mr. and Mrs. Agar. When Mrs. Agar remarried in 1971,

judgments and liens against Agar made it impossible to sell the property. As a result the Family Court of Hennepin County entered a money judgment against Agar in favor of Mrs. Agar to the extent of her interest in the property.

In September 1972, Midwest Federal Savings and Loan Association (hereinafter Midwest) foreclosed its first mortgage on the property. At the foreclosure sale Midwest received the Sheriff's Certificate of Sale after bidding the balance then due on the mortgage plus foreclosure costs. A few days before the redemption period expired, Agar told Hanratty that Midwest had agreed to transfer title to anyone Agar specified upon payment of the mortgage balance due plus expenses. Agar wanted Hanratty to provide $7,500, to take title to the property and to transfer title to a party Agar had already lined up. Hanratty was to receive $1,000 as his fee as well as payment of all of his fees due for legal services previously rendered Agar. Hanratty agreed and, approximately one week later, Agar brought an assignment of the Sheriff's Certificate of Sale to Hanratty who gave Agar a check for $7,500 payable to Agar. Title had been transferred to Hanratty during the period of redemption, but Hanratty contends that he believed he was buying Midwest's title, not redeeming for Agar. During the redemption period, none of Agar's creditors had attempted to redeem the property though it was worth substantially more than Midwest had bid.

Hanratty immediately made arrangements to sell the property to the Prossers, the party Agar had lined up. In the process of investigating Hanratty's title, the title insurance company discovered that Jerry Agar was then living at the premises. As proof that Agar had no adverse title interest to which the liens against him could attach, the company required an affidavit from Hanratty which stated that Agar had no right, title, or interest in the property and would receive none of the proceeds. Hanratty signed the affidavit admittedly knowing it was false. When Hanratty subsequently transferred title to the Prossers,

he received over $27,000. Out of the proceeds Hanratty retained enough to cover his payment to Agar, his past due bills and his $1,000 fee. He turned over part of the remainder to Agar and the rest to a friend of Agar's, Lawrence Lee Schuppel, to buy a farm in Schuppel's name for Agar.

Later Schuppel sold the farm property to prevent his credit rating from being ruined by Agar's failure to pay bills due on the property. Schuppel then contacted Hanratty, told him he had Agar's money, and turned over to him $8,040 in cash. Because his bank was closed, Hanratty placed the money in his personal account by using a night depository box. Hanratty contends that he had expected to receive a check and was not prepared to handle cash.

The next day Hanratty sent a check to Agar for $8,040, less additional legal fees Agar had incurred with Hanratty. Agar disputed the amount due Hanratty and Hanratty later cancelled the initial check and sent Agar a larger amount. Agar was still dissatisfied and the dispute ended up in Conciliation Court where Hanratty's fees were upheld. Nevertheless, Agar filed a complaint against Hanratty with the Lawyers Professional Responsibility Board. This proceeding arose out of the investigation begun as a result of Agar's complaint.

Pursuant to Rule 14, Rules on Lawyers Professional Responsibility, the case was referred to a referee, Retired District Court Judge C. A. Rolloff, for a hearing. The referee concluded that Hanratty knowingly and intentionally had allowed Agar to use his name in fraudulently purchasing the homestead and had acted as a conduit in transmitting Agar's fraudulently held funds between Agar and Schuppel. Further, the referee concluded that Hanratty had knowingly signed a false affidavit and had failed to maintain proper trust fund procedures.

Hanratty denies that he acted with fraudulent intent in taking title to the property. Questions on intent are always difficult because they involve the often unspoken motives of individuals.[1] If the necessary intent is found, the actions would support a finding of fraud on the part of Hanratty. Cf. *Slagle v. Slagle*, 187 Minn. 1, 244 N.W. 79 (1932). In signing the affidavit that stated that Agar had no interest in the property, however, Hanratty's intention is not an issue. He admitted that he signed it, knowing that part of it was materially false, for the purpose of selling the house.

A representative of the title insurance company testified that ordinarily the company would have required a quitclaim deed from a party with a possible adverse interest and that an affidavit from the owner would normally not be sufficient. Hanratty's affidavit was deemed sufficient specifically because he was an attorney. In reliance upon Hanratty's sworn statement, the title insurance company issued a title insurance policy and allowed the sale of the property to take place.

Nevertheless, Hanratty objects to the referee's specific conclusion that he was guilty of a violation of DR 1–102(A)(3), which provides: "A lawyer shall not engage in illegal conduct involving moral turpitude."

Hanratty argues that a violation of DR 1–102(A)(3) is equivalent to an accusation of criminal conduct and such an accusation must be made and proved in a manner consistent with constitutional safeguards.

The general rule is that an attorney may be disciplined for actions which are illegal but do not result in a criminal conviction. See, e. g., *Ohio State Bar Association v. Weaver*, 41 Ohio St.2d 97, 322 N.E.2d 665 (1975); 76 A.L.R.2d 1023 (1977). This court has not required a criminal conviction before disciplining an attorney for criminal misconduct. See, *In re Hertz*, 169 Minn. 431, 211 N.W. 678 (1927); *In re Glover*, 176 Minn. 519, 223 N.W. 921 (1929); *In re Friedman*, 183 Minn. 350, 236 N.W. 703 (1931); *In re Priebe*, 207 Minn. 97, 290 N.W. 552 (1940). Further, this court has disci-

1. The petitioners stated at oral arguments that Agar had not testified at the hearing because of difficulties involved in serving him with process. All of the evidence concerning the dealings of Agar and Hanratty thus came from Hanratty. The petitioner indicated that Hanratty had been cooperative in the investigation, both personally and through his attorneys.

plined an attorney even when a criminal conviction has not resulted from the actions complained of. *In re Forbes*, 192 Minn. 544, 257 N.W. 329 (1934); *In re Heinze*, 233 Minn. 391, 47 N.W.2d 123 (1951). Constitutional safeguards are required in criminal cases because of the nature of the sanctions which the criminal system can invoke. The same conduct can result in a civil action or a criminal action as well as a disciplinary action. Yet constitutional criminal safeguards do not apply in a civil action because criminal sanctions cannot be invoked. Similarly, in this action criminal sanctions cannot be invoked; therefore, criminal safeguards do not apply.

 The effect of DR 1–102(a)(3) is to bring the language of criminal offenses that involve moral turpitude into the Code of Professional Responsibility for the purpose of making such conduct a violation of the Code. Whether a respondent has already been convicted or may be convicted of a criminal offense in the future for the same actions is unimportant to a disciplinary proceeding. As we stated in *In re Hanson*, 258 Minn. 231, 233, 103 N.W.2d 863, 864 (1960):

> "Courts are charged with the duty of controlling the qualification and conduct of attorneys at law in order that there may be no compromise whatever of the moral and ethical standards upon which the functioning of our legal system depends. The purpose of disciplining an attorney is not to punish him, but to guard the administration of justice and to protect the courts, the legal profession, and the public. The public interest is and must be the paramount consideration; and the primary duty of the court must be protection of the public." (Footnote omitted.)

It is apparent that respondent, Gerald Hubert Hanratty, is, at the very least, guilty of misconduct in that he signed an affidavit knowing it to be false, in violation of the Code of Professional Responsibility. Although the petitioner has offered no evidence that such conduct was habitually or consistently practiced by the respondent, we feel that such conduct, even if entered into only once, cannot be ignored. Respondent's conduct requires a severe censure.

Further, it would be anomalous only to censure respondent for conduct which has resulted in substantial compensation. In a case such as this, we feel a civil fine or penalty is an appropriate sanction to impose on an attorney. Rule 15(a)(5), Rules on Lawyers Professional Responsibility, provides: "Upon conclusion of the proceedings, this Court may make such other disposition as this Court deems appropriate."

We hereby censure Gerald Hubert Hanratty and he is ordered to pay a civil fine of $5,000 to the Clerk of the Supreme Court within 30 days of the filing of this opinion. The $5,000 will be forwarded to the Lawyers Professional Responsibility Board. If payment is not received within 30 days, respondent will be suspended indefinitely in accordance with Rule 15(a)(2), Rules on Lawyers Professional Responsibility.